IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

FILED
SEP 17 2002
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| COMMUNITY BANK OF BLOUNTSVILLE, an Alabama banking corporation, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No.: CV-00-PT-1691-M |
| CARL GREGORY FORD L-M, INC., et al., | )<br>)<br>) |
| Defendants. | ) |

ENTERED
SEP 17 2002

## MEMORANDUM OPINION

This cause comes to be heard on defendant Carl Gregory's ("Gregory") Motion for Summary Judgment filed on May 7, 2002.

### FACTS[1]

Gregory opened defendant Carl Gregory Ford L-M, Inc. ("the dealership")[2] in Ft. Payne, Alabama, in approximately May of 1994. When the dealership opened, Gregory owned 90% of the common stock and defendant Doug Broaddus ("Broaddus") owned 10%. Currently, Broaddus is a 25% owner of the dealership with Gregory retaining 75% ownership. Broaddus served as the President and General Manager of the dealership at all times relative to the dispute. He was responsible for the day to day management of the dealership. Gregory holds the position of Chairman and Treasurer of the dealership.

In August of 1994, the dealership hired defendant Greg Anthony ("Anthony") as a

---

[1] As stated favorably to plaintiff.

[2] The dealership is a Sub Chapter S Corporation.

salesman. Anthony was promoted to the position of General Sales Manager by 1998.

Plaintiff Community Bank of Blountsville ("Community Bank") opened a branch office in the Ft. Payne Wal Mart in November of 1997. This branch office is located across the street from the dealership. Community Bank hired defendant Scot Parrish ("Parrish") as the manager of the branch office. Parrish's responsibilities included managing the day to day operations of the branch and reviewing and rejecting or approving automobile, consumer, and real estate loans.

During the spring and summer of 1998, the dealership sold a substantial number of automobiles, many of which were financed by Parrish through Community Bank. The salesmen at the dealership would "pre-qualify" potential customers by making an initial determination as to what car the customer was interested in and whether or not the potential customer would be able to purchase such car. If the potential customer had no credit or bad credit, the employees of the dealership would refer to them as "bogue" or "boge" customers. Anthony informed the sales staff at the dealership during sales meetings that Parrish would approve "bogue" customers at Community Bank. Anthony would take a majority of the credit applications of "bogue" customers to Parrish at Community Bank.[3] The salesmen were notified by Anthony to hold applications at the dealership while audits were being conducted at Community Bank.[4] (Green Depo. 59-60).

After the salesmen "pre-qualified" customers, they would take them inside the dealership

---

[3] According to salesman Jason Austin ("Austin"), Anthony was the only employee of the dealership that carried the applications to Parrish at Community Bank. (Austin Depo. at 28). Anthony would take the credit application, the buyer's order, and credit report to Parrish for his consideration. (Parrish Depo. at 156).

[4] Austin stated that Anthony informed the salesmen to hold applications while the audits were being conducted at Community Bank because Parrish was tied up with the audits and would be unavailable to review the applications. (Austin Depo. at 36-37). Apparently, Parrish was the only employee at Community Bank that could approve the loans.

to prepare a credit application. After compiling personal information from a customer on the credit application, a salesman would take the application to the sales desk or "tower" where the managers sat.[5] The salesmen were instructed by Anthony to place false information on the credit applications.[6] (Austin Depo. at 56); (Joye Depo. at 76); (Green Depo. at 37); (Osborn Depo. at 64-65); (Walker Depo. at 76-78); (Benefield Depo. at 49). The salesmen would suggest to the customers what their income, length of employment, or length of residence would need to be in order for them to qualify for credit. (Joye Depo. at 75); (Osborn Depo. at 64-65). After the salesmen finished the credit applications with the customers, they returned the applications to the sales managers. The sales managers would then contact credit bureaus to obtain the customers credit history. Once the credit history was received, the sales managers would determine to which bank the customer was directed to for financing.

Another common practice of the management at the dealership would be to inflate the value attributed to vehicles that were traded in by customers. (Ford Aff. ¶¶ 3 & 4). According to Ken Ford, Finance and Insurance Manager at the dealership, "the value of the vehicle being purchased was inflated sometimes in order to preserve the profit margin for the dealership, or to make sure the purchase could be financed." *Id.* Salesman Marty Osborn ("Osborn") testified that the price of a vehicle would be inflated to show that a down payment was being made. (Osborn Depo. at 82). According to Osborn, the dealership would write a check to the customer

---

[5] Three managers worked at the tower during the spring and summer of 1998. Anthony was the general sales manager. Wayne Hamm ("Hamm") was the used car manager. Chris Farmer ("Farmer") was the new car manager.

[6] Broaddus testified that he had never heard of any salesman at the dealership taking credit applications where information was either falsified or exaggerated. (Broaddus Depo. at 104). Anthony stated that he never talked to Gregory about false credit applications being submitted. (Anthony Depo. at 87). He testified that Gregory never encouraged false credit applications. *Id.*

3

in excess of the value of the item being traded in. *Id.* at 83. The customer would then endorse the check and use it to place a down payment on the vehicle. *Id.* at 83-84.

In 1998, Gregory was aware, by looking at the monthly financial reports on the dealership, that the Ft. Payne dealership was achieving a high volume of sales. Gregory became aware of the dealership's high volume of sales through financial statements generated by the dealership in Ft. Payne and sent to his office in Columbus, Georgia. Gregory and his office staff had access to these financial statements through its company-wide computer system. Gregory attributed the increased sales to the opening of the Wal Mart Super Center across the street from the dealership.[7]

Although Gregory was aware of the increased business, he only visited the dealership once or twice in 1998. Gregory did attend a late-summer cookout at the dealership to congratulate the employees on their hard work and to boost company morale.

After the summer of 1998, Community Bank lost approximately 2.7 million dollars due to defaulted auto loans issued to customers of the dealership by the Fort Payne Branch.[8] The Fort Payne branch had issued more than three hundred loans to customers of the dealership during the spring and summer of 1998. Apparently, many of these loans were processed and approved by Parrish. Other than a "Mont Blanc" pen, Parrish did not receive any money or benefits from Gregory, the dealership, or its employees.[9]

---

[7] Apparently, the dealership sold anywhere from 180 to 200 vehicles per month during the spring and summer of 1998. During the same time period the previous year the dealership sold between 125 and 150 vehicles per month.

[8] The dealership did not have a "dealership agreement" with Community Bank.

[9] Anthony delivered the pen to Parrish at the bank. According to Parrish, he did not receive any personal gain for having approved the loans for the dealership's customers. (Parrish Depo. at 159). He also states that his

4

## DISPUTED FACTS

Gregory denies ever discussing with anyone at the dealership the topic of selling cars to "bogue" customers. He does not recall having a conversation with Anthony concerning Parrish and Community Bank. He denies having been told by anyone at the dealership that it had a loan officer funding loans to "bogue" customers. Anthony testified that he told Gregory that the dealership's ability to achieve a high volume of sales in the summer of 1998 was based on the fact it "got a separate finance source." Anthony alleges that he told Gregory the details of the dealership's involvement with Parrish and Community Bank:

> Q. Did you tell him the details, who it was, anything like that?
> A. Yes, sir.
> Q. And did you tell him this finance resource would approve boge customers if we send them over there?
> A. I don't know that that's the words I used, but in a round about way, yes, sir.

(Anthony Depo. at 79). Additionally, Osborn testified that salesman Jim Joye ("Joye") told Gregory that it was easy to achieve record sales "when you had a banker in your pocket." (Osborn Depo. at 73).

Broaddus also denies being aware that Parrish was approving loans to "bogue" customers of the dealership. (Broaddus Depo. at 166). Anthony states that he "explained" to Broaddus that the dealership "had another finance source." (Anthony Depo. at 93). Anthony also states that they discussed what motivation Parrish had for approving such loans. *Id.* at 94. Anthony claims that Broaddus instructed him that "you can't bird dog the bank, you can't pay the guy, don't do nothing illegal, if he is just buying the deals straight up that's the way he is buying them." *Id.* at 93. Anthony informed Broaddus that he was not paying Parrish to approve the loans. *Id.* at 94.

---

family did not receive any financial gain. *Id.* at 160.

Additionally, Hamm testified that he had conversations with Broaddus concerning Parrish. (Hamm Depo. at 98). According to Hamm, the two would discuss why Parrish was approving the loans. *Id.*

Salesman Clay Green ("Green") stated that Anthony and salesman David Cornelius ("Cornelius") handwrote false credit references on the credit applications. (Green Depo. at 39-40). Salesman Osborn testified that Anthony physically altered credit applications by cutting off derogatory information and taping the application back together after it had been submitted to the credit bureaus. (Osborn Depo. at 63). Anthony denies ever falsifying a credit application. (Anthony Depo. at 36). Osborn also states that management at the dealership would instruct its salesmen during sales meetings as to the criteria needed on credit applications from potential customers. (Osborn Depo. at 60). Osborn claims that Broaddus was present at some of these meetings. *Id.* at 61. Broaddus denies being aware that salesmen and managers were falsifying or exaggerating credit applications. (Broaddus Depo. at 104; 175-76).

## ARGUMENTS

Community Bank has filed a civil action alleging the following claims against Gregory: Count I - RICO Financial Institution Fraud; Count II - RICO Conspiracy; Count III - Fraud, Misrepresentation and Deceit; Count IV - Suppression; Count VII - Negligent/Wanton Training and Supervision; Count VIII - Civil Conspiracy; Count IX - Alabama Code § 6-5-370. Gregory argues that he is entitled to summary judgment on each and every cause of action asserted by Community Bank.[10]

---

[10] Neither party initially directly addressed whether an officer of a corporation can be directly liable, in his or her individual capacity, for illegal actions taken by other employees of the corporation. The parties have now briefed that issue. It is a close question.

Addressing the financial institution fraud claim, Gregory points out that one is guilty of financial institution fraud when one "knowingly executes, or attempts to execute, a scheme or artifice – (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344. Gregory argues that this claim must fail because there has been no evidence that he had any knowledge of any intent or action on the part of anyone associated with the dealership, or on the part of Parrish, to defraud Community Bank. He claims that such knowledge cannot be inferred from the increased sales at the dealership during the summer of 1998. According to Gregory, this inference cannot be made because the opening of the Wal Mart Super Center across the street from the dealership increased the number of potential customers traveling by the dealership. Additionally, Gregory contends that his knowledge of a scheme to defraud cannot be inferred from the alleged comments made to him by Joye at the dealership cookout. Gregory asserts that Anthony's statement that the dealership had an additional source of financing and Osborn's testimony that he allegedly heard Joye tell Gregory that the dealership had a banker in its pocket does not equate to knowledge or suspicion of any scheme to defraud Community Bank.

Turning to the RICO conspiracy claim, Gregory points out that in order to be guilty of a RICO conspiracy, a defendant must either agree to commit two predicate acts or agree to participate in the conduct of the enterprise with the knowledge and intent that other members of the conspiracy would commit at least two predicate acts in furtherance of the enterprise. (Relying on *United States v. Carter*, 721 F.3d 1514, 1531 (11th Cir. 1984)). He notes that an alleged conspirator need not have full knowledge of every detail regarding the conspiracy, it

7

would be sufficient if he knew of the "essential nature of the plan." *United States v. Kopituk*, 690 F.2d 1289, 1323 (11th Cir. 1982). Gregory claims that there is no evidence that he engaged in any conduct that could be construed as a predicate act, engaged in conduct with the intent that others commit a predicate act, or that he knew of the "essential nature of the plan." In support of this argument, he states that there is no evidence that he ever met Parrish or had regular contact with his salesmen.

Gregory also argues that the fraud, misrepresentation and deceit claim must fail for lack of evidence. He states that there is no evidence that he made any representations to Parrish or any employees of Community Bank. He points out that he never met with any customers or completed any credit applications. Finally, he claims that there is no evidence of a conspiracy that would subject him to liability for the actions of a co-conspirator.

Addressing the suppression claim, Gregory argues that no evidence has been presented that he knew of the alleged falsification of credit applications by salesmen of the dealership. Consequently, he asserts that he could not have suppressed what he did not know. Furthermore, he contends that he could not have alerted Community Bank when he had no knowledge of the alleged conduct. Additionally, he argues that Community Bank's assertion that he suppressed the fact that the bank had a dishonest and corrupt officer who was approving "bogue" loans is without merit. He points out that he never met Parrish. He states that no employee ever informed him that Parrish was funding "bogue" loans. Finally, he notes that he was never informed that Parrish was corrupt. In conclusion, Gregory asserts that there was no duty on his part to communicate anything to Community Bank.

In discussing the merits of the negligent/wanton training and supervision claim, Gregory

8

points out that in addition to requiring proof that an employer knows or should know that an employee is incompetent, a claim of wanton supervision carries the additional requirement that the plaintiff demonstrate that the employer has "wantonly disregarded its agent's incompetence," i.e., that it acted or omitted to act "with reckless indifference to the consequence of said act . . . or omission," being "aware from [its] knowledge of existing circumstances and conditions that [its] conduct would probably result in injury to another or in damage to [another's] property." *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, No. 1992302, 2001 WL 996066 at *13 (Ala. Aug. 31, 2001). Gregory claims that there is no evidence that he had any knowledge of any wrongdoing on the part of any manager or salesman at the dealership. He points out that Anthony was trained that the dealership did not lie to sell cars. (Anthony Depo. at 34-35). He concludes by noting that there has been no evidence presented that any alleged fraudulent conduct was brought to the attention of himself or Broaddus.

Addressing the civil conspiracy claim, Gregory states that a civil conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means. *See Eidson v. Olin Corp.*, 527 So. 2d 1283 (Ala. 1988). He notes that a conspiracy cannot exist in the absence of an underlying tort. *See Jones v. BP Oil Co.*, 632 So. 2d 435, 439 (Ala. 1993). Since no evidence supports any of the underlying causes of action asserted by Community Bank, Gregory concludes, the bank's cause of action for civil conspiracy must fail.

Finally, Gregory argues that he is entitled to summary judgment on Community Bank's cause of action under Alabama Code § 6-5-370. He notes that Alabama Code § 6-5-370 provides that "for any injury, either to person or property, amounting to a felony, a civil action may be

9

commenced by the party injured without prosecution of the offender." Gregory contends that this statute does not create a cause of action. Instead, he argues that it merely allows a plaintiff to commence a civil action even if the plaintiff does not pursue criminal prosecution of the defendant. *See Lewis v. Fraundfedler*, 796 So. 2d 1047 (Ala. 2000).[11]

In response, Community Bank notes that to prevail on a claim of financial institution fraud, it must prove that Gregory (1) knowingly (2) executed or attempted to execute (3) a scheme or artifice (4) to defraud a federally insured financial institution. *See United States v. Swearingen*, 858 F.2d 1555, 1557 (11th Cir. 1988). It points out that Gregory does not appear to dispute that there was a scheme or artifice to defraud Community Bank.[12] Thus, Community Bank argues that it must only present evidence of Gregory's knowledge of the scheme, or at least his reckless disregard of the scheme, to defeat his motion for summary judgment.[13] Community Bank claims that the following testimony and facts present substantial evidence that Carl Gregory had knowledge of the scheme to defraud Community Bank.

First, it presents testimony of Ford. It claims that Ford testified in his affidavit that "it was common practice for the Carl Gregory Ford management to inflate the value attributed to vehicles that were traded in by customers." (Ford Aff. at ¶ 3). Ford further testified that "the

---

[11] The court tends to agree with this argument and will do so unless, within ten (10) days, the plaintiff submits to the court and serves a specific controlling case to the contrary.

[12] Community Bank argues that any argument by Gregory to dispute this fact would be fruitless because financial institution fraud charges are routinely brought where false loan applications are submitted. *Relying on United States v. Walsh*, 75 F.3d 1 (1st Cir. 1996).

[13] Community Bank comments that fraudulent intent may be established by circumstantial evidence and inferences drawn from all the evidence. *See United States v. Cloud*, 872 F.2d 846, 852 n.6 (9th Cir. 1989). It also points out that several circuits have noted that "reckless disregard" satisfies the intent requirement under the financial institution fraud statute. *See United States v. Ely*, 142 F.3d 1113, 1121 (9th Cir. 1997).

10

value of the vehicle being purchased was inflated sometimes to preserve the profit margin for the dealership, or to make sure the purchase could be financed." *Id.* Community Bank notes that Ford stated that the entire management team, including Gregory, was aware of this practice. *Id.* at ¶ 4. It further comments that Ford stated that the entire management team, including Gregory, was aware that the dealership was sending "bogue" customers to Parrish to get financing.

Second, it argues that Gregory's knowledge of the scheme can be inferred because of the dealership's increase in sales in 1998. It points out that Broaddus testified that Parrish and Community Bank contributed to the improved sales in 1998. (Broaddus Depo. at 106). Furthermore, it comments that Anthony testified that Parrish's funding of "bogue" loans was responsible for the increase. Finally, it notes that Gregory received and reviewed regular reports from the dealership and was aware of the increased sales.

Third, it argues that Anthony's testimony regarding his conversation with Gregory presents a jury question as to whether Gregory had knowledge of the scheme to defraud. According to Community Bank, Anthony testified that he told Gregory that he had a finance company that would approve "bogue" customers and there is no evidence that Gregory ever told him to stop. It states that Gregory denies having this discussion with Anthony. Thus, it claims that a jury question is presented as to whether Gregory had actual knowledge of the financial institution fraud.

Finally, it points to the testimony of Osborn to demonstrate that summary judgment is not appropriate for the financial institution fraud claim. It states that Osborn testified that Gregory hosted a steak dinner at the dealership. According to Osborn, one of the salesmen told Gregory that the dealership's success was easy to accomplish "when you had a banker in your pocket." It

11

concludes that this testimony certainly demonstrates reckless disregard on Gregory's part.

Turning to the RICO conspiracy claim, Community Bank asserts that Gregory did not have to personally engage in a predicate act. It states that the Eleventh Circuit has observed that "when a defendant agrees to become a member of a conspiracy with the essential RICO objective, further proof that the defendant agreed to personally commit two predicate acts is not necessary." *United States v. Carter*, 721 F.2d 1514, 1530-31 (11th Cir. 1984). It asserts that a defendant merely must agree to perform services which facilitate activities of those who are operating the enterprise in an illegal manner. *Relying on Brouwer v. Raffensperger Hughes & Co.*, 199 F.3d 961 (7th Cir. 2000). It argues that Gregory certainly knew of the "essential nature of the plan" to defraud Community Bank. In support of this argument, it states that Anthony testified that he told Gregory that he was sending "bogue" customers to Community Bank. It notes that Ford testified that Gregory had full knowledge that the dealership was inflating the amount of value given for traded in vehicles. Furthermore, it asserts that Gregory was aware of the increased sales in 1998.

As for the fraud, misrepresentation and deceit claim, Community Bank notes that it is well established under Alabama law that a director of a corporation "may not participate in a tort perpetrated through the agency of a corporation, or in a fraudulent injury to another, without being civilly responsible." *Rudisill Soil Pipe Co. v. Eastham Soil Pipe & Foundry Co.*, 97 So. 219 (Ala. 1923). It claims that the testimony of Ford, Anthony, and Osborn link Gregory to the scheme or, at the very least, present a jury question at to whether Gregory was a participant. Furthermore, it notes that numerous salesmen testified that the falsification of financial documents that were sent to Parrish were done at the direction of Anthony. Despite this

12

testimony, Community Bank points out that Anthony was recently rehired in a management position at the dealership. It concludes that this action amounts to a ratification of Anthony's wrongful conduct.

Community Bank also argues that Gregory is not entitled to summary judgment on the suppression claim. According to Community Bank, the Alabama Supreme Court and the Eleventh Circuit have held that "[w]here one person has superior knowledge of a fact and suppression of that fact will induce another person to take action that he or she otherwise would not take, the obligation to disclose is particularly compelling." *Life Ins. Co. of Georgia v. Parker*, 706 So. 2d 1108, 1113 (Ala. 1997); *see also Dominick v. Dixie Nat'l Life Ins. Co.*, 809 F.2d 1559 (11th Cir. 1987). It claims that Gregory had superior knowledge over Community Bank. It states that Gregory knew his dealership was sending "bogue" customers to Community Bank, and that the dealership had Parrish in its "pocket." It concludes that Gregory knew of this information and had a duty to disclose.

Turning to the negligent/wanton training and supervision claim, Community Bank states that to prevail, it must show that the alleged incompetence of the employees was actually known to the employer or was discoverable by the employer if it had exercised care and proper diligence. *See Godby v. Montgomery County Bd. of Educ.*, 996 F. Supp. 1390 (M.D. Ala. 1998). It claims that the evidence presented demonstrates that Gregory had actual knowledge of the scheme. Furthermore, it claims that if Gregory had exercised due care, he certainly would have known that the salesmen at his dealership were falsifying loan applications. At the very least,

13

Community Bank contends that this is an issue that should be decided by the jury.[14]

Community Bank notes that Gregory's argument for summary judgment is that a person can only be liable for civil conspiracy if there is liability for an underlying cause of action. According to Community Bank, the testimony of Ford, Anthony, Osborn and various salesmen is more than enough evidence for it to survive summary judgment on all claims alleged against Gregory. Thus, the claim for civil conspiracy should survive summary judgment as well.

Finally, Community Bank asserts that Count IX of the Second Amended Complaint states a claim under Alabama Code § 6-5-370 for civil liability for felonious injury. It concludes that there is substantial evidence in the record to support this claim.[15]

In reply, Gregory takes issue with the five areas of evidence relied upon by Community Bank in its opposition. First, he argues that the Ford affidavit should be given no weight because Ford has clarified his first affidavit by providing a second affidavit. According to Gregory, Ford has testified in his second affidavit that when he referred to "Carl Gregory" in his first affidavit, he was referring to the dealership, not the individual. Due to this clarification, Gregory argues that Community Bank cannot establish through Ford's testimony that he was aware that the dealership inflated the value of trade-in vehicles to distort the financial condition of the customer, and that he knew that the dealership sold vehicles to "bogue" customers who were referred to Community Bank for financing.[16]

---

[14] Again, Community Bank points to the testimony of Ford, Anthony, and Osborn to support this contention.

[15] *See Ala. Code § 6-5-370 (1975).* See earlier note.

[16] According to Gregory, the biggest fallacy with Community Bank's theory in this case is its insistence that it was improper for the dealership to refer a customer to Community Bank when the dealership allegedly knew the customer had little or no credit. Although he denies being aware that the dealership was referring "bogue"

14

Second, Gregory reasserts that the increase in sales in 1998 is not sufficient to create a genuine issue of material fact with regard to his knowledge of some scheme to defraud Community Bank. He claims that brand new Wal Mart Super Center was the contributing factor for the increased sales.

Third, Gregory argues that Community Bank has misrepresented Anthony's testimony. According to Community Bank, Anthony informed Gregory that he had a finance company that would approve "bogue" customers. Gregory states that Community Bank failed to advise the court that Anthony in fact testified that in his discussion with Gregory, he did not tell Gregory that Community Bank was financing "bogue" customers: "Q. There was some testimony earlier about discussions you had with Carl Gregory? A. (Witness nods head.) Q. When you were talking to Mr. Gregory, did you use the term bogue customer? A. No, ma'am." (Anthony Depo. at 160-61). Gregory states that he does not recall this conversation. Nonetheless, he argues that Anthony's testimony concerning a new financing source making loans to customer with little or no credit does not give rise to an inference that Gregory knew that the loans were based on fraudulent information allegedly provided by the dealership.

Fourth, Gregory claims that Osborn's testimony does not present a genuine issue of material fact for two reasons. First, he notes that Osborn claimed to hear Joye tell Gregory that record sales were easy to accomplish "when you had a banker in your pocket." Gregory points out that there is no such testimony from Joye. Furthermore, he comments that Community Bank admits that such a statement may not have been in those exact words. Second, he claims that

---

customers to Community Bank, Gregory states that such evidence is not proof that he had any knowledge that such financing was based upon fraudulent credit applications.

15

even if Joye said words to this effect, there is no evidence that such words meant that the dealership was providing fraudulent information to Community Bank to secure loans for customers.

Finally, Gregory argues that Community Bank's contention that Anthony's rehiring constituted ratification of the alleged conduct is without merit. Gregory had no prior knowledge that Anthony was being rehired and did not participate in this decision. (Gregory Aff. ¶¶ 3 & 4). According to Gregory, Broaddus made the decision to rehire Anthony. He notes that Broaddus did not consult with or advise him of this employment decision. (Broaddus Depo. at 177-78).

## MOTION FOR SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed during the pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Id.* The non-moving party then bears the burden of showing that there are specific facts demonstrating that there is a genuine issue of fact for trial. *Id.* at 324. "When deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). The trial court must resolve all reasonable doubts in favor of the non-moving party, but need not resolve all doubts in a similar fashion. *Barnes v. Southwest Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987).

## CONCLUSIONS OF THE COURT

The factual and legal issues are very close. The real issue seems to be whether Gregory knew, or recklessly disregarded, that false information was being submitted in applications and, having the power to do so, failed to take action to stop the practice. If "bogue" simply means "bad credit" and Parrish knew of the bad credit and was just willing to take the risk, there would likely be no liability of anyone associated with the dealership. What Gregory knew and his legal responsibility with regard thereto are close, but there are, perhaps, genuine issues of fact and law. The motion will be denied.

This 17 day of September, 2002.

ROBERT B. PROPST
**SENIOR UNITED STATES DISTRICT JUDGE**